This is Steckel v. Consolidated Grain for the appellant, Mr. Cochran, and for the athlete, Mr. Tyler. You may proceed. Thank you. Good afternoon. It's unfortunate that the party that's responsible for the damages to both the Steckels and Consolidated Grain and Barge in this case is not before the court. That person is Rick Bierman. He is the farm tenant on the Steckels farm. In 2005 and 2006, he contracted to sell corn to Consolidated Grain and Barge for futures delivery. At that time, the current market price for corn was about $3.20 a bushel. As you may be aware of, over the next two years, there was a considerable run-up in the corn market, fueled by a lot of ethanol and speculators. During this two-year period, Consolidated Grain and Barge worked with Rick Bierman to give him the opportunity to realize this upturn. They did that by... Counsel, I don't understand that. I've never heard of an elevator rolling a contract like that. Could you explain that to me? Okay. What they did, when they're working with their producers, in a rising market, as dramatic as it was, a lot of the elevators wanted to assist the farmers to take advantage of this upturn in the market. So they would agree to amend their contracts to incorporate a new futures price. In the case of Consolidated Grain and Barge, they would charge from $0.01 to $0.02 a bushel to renegotiate the contract. The price upturn may have been $0.15 or $0.20 or $0.30 a bushel. They would redo the contract for $0.01 or $0.02 and plug in the new futures price so that the farmer would be able to reap the benefit of that upswing in the market. And they did this repeatedly with Rick Berman's contracts during that period. Are you telling me when an elevator agrees to a contract, say for January 2011 corn, they don't, at the same time, sell that much corn? Say it's for $10,000 bushels? They have a wide variety of portfolios. Some of those resell, others they'll hold for speculation. And so it's a common practice that an elevator will allow, just because the market goes up, the farmer for a cent or two to renegotiate the contract at a higher price? I won't say it's a common practice, but it was certainly the practice of this elevator, this terminal of Consolidated Grain and Barge with this farmer during this period. Okay. I've got you kind of off here. No, that's fine. It's not real important. I was just curious about that. That's fine. Please go ahead with your argument. Well, and also during this period, if they were doing these renegotiations, they helped Rick Berman secure some option contracts, which could have allowed him to take advantage of the market, or if he had a shortfall in production, would allow him to exercise those options and cover his shortfalls under his contracts with Consolidated Grain and Barge. Unfortunately, Mr. Berman never produced the corn and never exercised his options. So he couldn't deliver under the contracts, and as a result, Consolidated Grain and Barge suffered substantial damage as well in excess of $100,000. Steckel's situation is much simpler. They cash rented their farm to Rick Berman for the OA crop year. Berman went on the farm, planted the crop, harvested it, but he never paid any cash rent to the landlord. So that's what brings us to the situation we are today, is to decide between two agreed parties who has priorities to this 2008 grain crop. We submit it should be Consolidated Grain and Barge. I think in our filings and our memorandum, it's our position there's no controlling state statute on this issue. We also feel there's no controlling case law. I know that Mr. Tylett disagrees with that and he relies on the Dwyer case decided by Judge Mills in this very court. But I think it's clear that case dealt with priorities between a statutory landlord lien and a UCC security interest by a bank. And in that case, they held rightfully that the statutory landlord lien prevailed over a UCC security interest. Judge Mills cited four cases. None of those cases dealt with the right of offset, whether by contract or common law. So I don't believe they're controlling. I think Mr. Tylett has it right in his memorandum, page 8, when he's discussing the recent amendments to the statutory landlord lien, dealing with whether you have to perfect or not according to UCC. I think in there he states, in order to maintain the landlord lien's historical priority status over UCC liens, I think that's critical. It's over UCC liens. The right of offset is not a UCC lien, whether common law or contract. And it's specifically excluded as a security interest under Article 9 of the UCC. So I think we're in a situation where there's no controlling statute, there's no controlling case law. So we're looking at what's common law say. And I think we point out in this situation, you look at the general principle is first in time, first in right. And I think when you look at that in all manner, consolidated grain and barge comes out ahead. Their right arose under contracts, entered into in 05 and 06, a full two years before the stack of 2008 farm lease. When you look to the advance of default that would trigger these rights, in the case of consolidated grain and barge, that occurred in June of 08, when Bierman said he wasn't going to be able to deliver under the contracts and was in breach. The earliest that the breach occurred under Steckles was after the rent was due, which it's not clear from the record, but it was probably sometime in December or the first of the year that rent was due. So that was a full six months after the breach of the obligation to consolidated grain and barge. And finally, if you look at when the parties exercised the rights created by this breach, consolidated grain and barge did it immediately. As soon as they came into possession of the grain at the end of 08, they exercised their right of office. Whereas the Steckles, their rent was due sometime in December, the first contact they had with respect to the rent was a letter from their attorney in February of 09. So in all cases, consolidated grain and barge has preceded the Steckles in action under their rights. So I think in those circumstances, when you look at first in time, first in right, that consolidated grain and barge should be entitled to priority over the 2008 grain problem. And we would respectfully request that the court… Well, would you agree that there's nothing to offset against until the grain is delivered? That is correct. Well, at the time that the grain is delivered, it is subject to a landlord's lien, correct? Yes, but it's also subject to the right of offset, both under contract and common law. I mean, they're clearly conflicting here, and we need to decide which has priority. Well, logically it seems to me that at the time the grain is delivered, the grain is subject to a landlord's lien. So why wouldn't that take precedent over the right to offset? Because you can't offset against anything until the creditor receives something of value, takes possession of something of value. Well, I think the consolidated grain and barge right of offset accrued at the time of the breach was in June, and they were able to exercise it when they came into possession. And that was a right that preceded the landlord's lien. Why doesn't the landlord's lien begin to exist as the crops are growing in the field? It attaches then, but until there's a breach, until the tenant has failed to pay the rent, the landlord doesn't have any right to the crop. Until the tenant breaches his obligation to pay the rent, that lien cannot be exercised. Do you have an additional argument? We have no questions. Thank you. Thank you. May it please the Court. Mr. Cochran, what consolidated proposes here is to reverse over 100 years of statutory common law in this state. The case cited by Dwyer, or the case of Dwyer actually cited Lillard v. Noble and Wetzel v. Mayer, two Illinois Supreme Court cases that were based upon this very statute as it existed in the late to middle 1800s. And each case citing that statute used exactly the same broad language, that the landlord's lien was paramount to all other liens and all other interests in crops. With respect to the statute, I would submit that the present statute, Mr. Cochran, attempts to construe too strictly in that it appears to me that in light of Dwyer and in light of Farmer's Grain and Supply Company v. Skinner, the companion case that was heard about the same time, which held that the landlord's lien had priority over a UCC established ag law lien, that as a result of those cases the legislature sought to protect, if you will, those who obtained a landlord or an ag lien or those who obtained a financial lien pursuant to the UCC by requiring, in order to perfect its lien, that the landlord then follow that procedure of obtaining priority by filing some kind of a financing statement within the period of the lien itself. And so the legislature established that lien in one year, or I mean that procedure in one year, and then in the next year in fact eliminated the procedure but did not eliminate the fourth paragraph which addressed only the landlord's lien vis-a-vis UCC created liens. There's no indication by the amendment of the statute of 2001 and 2002 that the legislature intended to the paramount right of the landlord's lien over all other liens and interests. The second thing I think that Mr. Cochran is incorrect about is concerning the application of the particular liens involved here. It is clear from the statute and the case law that the landlord's lien is perfected without the landlord doing anything. It doesn't have to do anything whatsoever. It relates back to the time of planting and then continues for a period of six months after the lease runs. On the other hand, with respect to a lien of this nature, it is more akin, I would submit, to a real estate mortgage in which the bank requires that the borrower also pledge income, rents and profits, from the land. In the situation of those rents and profits, what that creates is not a specific lien but in fact what's been called by the court in Illinois an equitable lien upon those rents and profits which may be enforced by the mortgagee upon default and by simply taking possession of the mortgage property. Another case decided in Illinois, Marchant v. Artress, Artists' Embassy, Inc. indicates that in order for the first in time and first in right principle to be established or utilized, that in fact the lien must be specific and it must be perfected to be acknowledged as a first in time lien in determining priority liens. Well, I would submit that the underlying instrument in this case was signed in 2005 and 2006. It's clear from the correspondence from Consolidated's counsel that the lien enforcement was triggered by the default. It's clear by the way the grain contracts read that default is what triggers the assignment. In fact, in those cases, perfection and actual identification of the specific property or rate at which the lien attaches only comes about one after default which would have been June of 2008 after this crop was planted and secondly after possession by Consolidated in December 30th, 31st and actually the early part of January 2009. And so even under that first in and first of right analysis, Consolidated does not have any particular advantage in this particular case. The landlord's lien statute, I would submit your honors that cases indicate for over 100 years that anyone who takes an interest in grain takes it with notice that there may be a landlord's lien and the appellate courts of even this district or this appellate district have held that once one is aware that a party is a tenant that they've got affirmative duty then to ascertain whether or not there is an unpaid landlord out there or if they're not a good faith purchaser. And this is a situation where clearly Consolidated is not a good faith purchaser. They sought merely to try to capture some potential lost profits. So it doesn't make any difference whether the lease is crop share or cash rent as the landlord's lien? It does not appear to, no. In this case it's not as if Consolidated lost anything out of pocket other than a few cents to roll over these contracts. What they're seeking is a lost profit that's based upon not only what the crop may have been worth in actual dollars and cents if it was produced at the time of breach, but what it would have actually been worth six months in the future when it was to be produced under the terms of the contract. That even goes beyond the lost profits element of damages in this particular state to try to seek damages for lost profits on something that is simply deliverable in the future. I would submit, Your Honors, that there simply is no basis to grant Consolidated a right to set off any special privilege in this particular case. Where the courts in this case have repeatedly and consistently found that the landlord's lien trumped UCC liens and priorities, and it also trumped the Probate Act and classifications of debts for repayment under probate and numerous other types of liens, I would submit that without some statutory authority establishing the right to set off as in a government tax lien, which is given priority under statute, that Consolidated simply has no position as tenable in this case. Thank you. I just want to respond to a few points. First of all, the Stackles were in the same boat as Consolidated Green and Large. They weren't out at any out-of-pocket expenses. This was a cash rent. They weren't a share crop, so they didn't front money for the crop. So they're just out there at rent. They're in the same boat as Consolidated Green and Large. With respect to the two cases he mentioned cited by Dwyer, Lillard and Wetzel, Lillard involved an issue whether a landlord lien should be classified in the same category as a Class VII claimant or probate. It had nothing to do with offset. Wetzel involved a situation where the landlord initially filed a distress warrant for a coverage rent and then abandoned it. The issue was whether by doing that he abandoned his statutory property. So neither one of those dealt with the offset. In the 100-year history of case law, none of those cases dealt with offset. Also, the good-faith purchaser issue is kind of a red herring because we've never asserted that Consolidated Green and Large was a good-faith purchaser in trying to assert that defense to what they did. Also, Mr. Tylett said that the default in June of 2007 occurred after the crop was planted. There's no allegations, there's no proof in the record as to when this crop was planted. There's beans. As we know, beans can be planted from early May to the end of June. And then they have to start growing. So there's nothing in the record that would substantiate that one way or the other. I think those are the only points I wanted to address. Thank you, counsel. We'll take this matter under advisement. This has until tomorrow.